# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1449V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* *

|  |  |
|---|---|
| MARK JOHNSON | * TO BE PUBLISHED |
| Petitioner, | * Special Master Katherine E. Oler |
| v. | * Filed: August 13, 2021 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * Attorneys' Fees & Costs; |
| | * Reasonable Basis |
| Respondent | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* *

*Otwell S. Rankin*, B. Dahlenburg Bonar P.S.C., Covington, KY, for Petitioner.
*Debra A. Filteau Begley*, U.S. Department of Justice, Washington, D.C., for Respondent.

## DECISION ON FINAL ATTORNEYS' FEES AND COSTS[1]

On November 3, 2016, Mark Johnson ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program,[2] alleging that he suffered from "a constellation of symptoms" including "severe headache, right-sided facial numbness, vision abnormalities, and memory defects" from the influenza ("flu") Fluvirin vaccine he received on November 7, 2013.[3] Pet., ECF No. 1; *see also* Am. Pet., ECF No. 48. At the time, Petitioner was

---

[1] This Decision will be posted on the Court of Federal Claims' website. **This means the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). If, upon review, I agree that the identified materials fit within this definition, I will redact such material from public access. Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

[3] Petitioner submitted an Amended Petition on June 7, 2019, in which he alleged that at various times, he had received diagnoses of "viral polyganglionitis, viral polyneuropathy, vestibular neuronitis, vertigo, migraine, cranial neuropathy, encephalitis, and encephalomyelitis." Am. Pet. at 1, ECF No. 48.

represented by Mr. Isaiah Kalinowski. Mr. Rankin, petitioner's current attorney, was substituted as counsel on March 27, 2018. ECF No. 39.

On February 23, 2018, Mr. Kalinowski submitted a motion for interim attorneys' fees and costs, requesting $39,165.00 in fees and $4,439.46 in costs. ECF No. 35. That motion was deferred until resolution of this case. ECF No. 41.

On July 1, Petitioner filed a motion for final attorneys' fees and costs, requesting $22,303.72 in attorneys' fees and $7,223.54 in costs. Final Fees App. Ex 1 at 1, ECF No. 59.

For the reasons discussed below, I hereby **GRANT IN PART** Petitioner's application for interim fees and costs and award a total of **$40,678.71** in interim fees and costs.

For the reasons discussed below, I hereby **GRANT IN PART** Petitioner's application for final fees and costs and award a total of **$22,029.09** in final attorneys' fees and costs.

## I.       Procedural History

Petitioner's initial petition was filed on November 3, 2016. ECF No. 1. Petitioner filed several medical records (Exs. 1-9), an affidavit (Ex. 10) and medical literature (Exs. 11-30) in support of his claim. ECF Nos. 6-9. Petitioner filed a statement of completion on December 6, 2016. ECF No. 10.

On January 9, 2017, Respondent filed a status report identifying several missing medical records and requested that Petitioner file them. ECF No. 13. On February 9, 2017, Petitioner filed a letter from Dr. James Curell, who wrote that "[Petitioner] has difficulty concentrating, remembering, following instructions, and controlling his emotions, including his temper. The only reasonable explanation for [Petitioner's] condition is an auto immune reaction to the vaccine." Ex. 31, ECF No. 15-2. Petitioner filed additional medical records on March 13, 2017 (Exs. 32-33) and March 21, 2017 (Ex. 34). ECF Nos. 17, 19. Petitioner filed an updated Statement of Completion on March 21, 2017.  ECF No. 20.

On May 5, 2017, Respondent filed his Rule 4(c) report, indicating that this case was "not appropriate for compensation under the terms of the Act." Resp.'s Rep. at 2, ECF No. 22. Respondent argued that (1) it is unclear what injury Petitioner alleges was caused by his flu vaccination; and (2), Petitioner had not provided medical records or an expert report that addressed both the issues of diagnosis and the *Althen* requirements. *Id.* at 7-8.

On October 5, 2017, this case was transferred to then-Special Master Brian Corcoran.  ECF No. 28.  It was transferred to my docket on December 4, 2017. ECF No. 31.

On February 23, 2018, Mr. Kalinowski filed a motion to withdraw, indicating that Petitioner "would prefer to retain alternate counsel." ECF No. 36.[4] On the same date, Mr. Kalinowski submitted a motion for Interim Attorneys' Fees and Costs. ECF No. 35. On March 9,

---

[4] Mr. Rankin was substituted as Petitioner's counsel on March 27, 2018. ECF No. 39.

2018, Respondent filed a Response to Petitioner's Motion, contesting reasonable basis. ECF No. 37. Petitioner filed his reply on March 12, 2018. ECF No. 38.

On April 13, 2018, I issued a Non-PDF Order, stating that, "In light of Respondent's recent objections regarding the reasonable basis of this claim…Petitioner and his new counsel shall carefully review the record of this case and file a status report by June 12, 2018, informing the Court on how he would like to proceed." *See* Non-PDF Scheduling Order of April 13, 2018.

On June 11, 2018, Petitioner filed a status report stating that he wished "to continue to pursue Petitioner's vaccine injury claim." ECF No. 40 at 1. Petitioner requested the opportunity to file an Amended Petition and an expert report to support his claim. *Id.* at 1-2.

On July 24, 2018, I issued an order deferring a ruling on Petitioner's interim fees and costs application, as Petitioner had "not presented evidence of undue hardship as outlined in *Avera* in order to justify a grant of interim fees." ECF No. 41 at 4. I instructed Petitioner to file his amended petition, an expert report and a VAERS report by September 7, 2018. *Id.* at 4-5.

On August 31, 2018, November 1, 2018, January 7, 2019, March 11, 2019, April 25, 2019, and May 28, 2019, Petitioner requested extensions of time to file these documents. ECF Nos. 42-47. On June 7, 2019, Petitioner filed an Amended Petition, an expert report from Dr. Jeffery Kuhn (Ex. 38), and several pieces of supporting medical literature (Ex. 39-42). ECF No. 48.

On July 10, 2019, Respondent filed a status report indicating that he had reviewed Petitioner's filings and it "remains unclear what injury Petitioner claims was caused by his vaccination, and the report from his expert does not appear to meet Petitioner's burden under the Vaccine Act." ECF No. 49 at 1.

On August 7, 2019, I held a status conference. *See* Scheduling Order of August 7, 2019, ECF No. 50. At this status conference, Respondent again raised the issue of reasonable basis. *Id.* at 1-2. I explained to the parties that at the time, I did not believe that Petitioner lacked reasonable basis to file his petition, but that he "risks losing reasonable basis if he cannot find an expert report in support of his claims." *Id.* at 2. I reminded Mr. Rankin that "use of Court resources when a claim has shown itself to be untenable results in a loss of reasonable basis." *Id.* I ordered Mr. Rankin to file a status report indicating how Petitioner wished to proceed.

On November 6, 2019, Petitioner filed a status report indicating that he wished to dismiss his case. ECF No. 54. On December 6, 2019, Petitioner filed a motion to dismiss, which I subsequently granted on December 10, 2019. ECF Nos. 55-56.

Petitioner filed a Motion for Final Attorneys' Fees and Costs on July 1, 2020. Final Fees App., ECF No. 59. Respondent filed a response contesting reasonable basis on July 16, 2020. Final Fees Resp., ECF No. 60. Petitioner filed a reply on August 20, 2020. Final Fees Reply, ECF No. 63.

This matter is now ripe for adjudication.

## II.    Petitioner's Relevant Medical History

Petitioner was born in 1973. Ex. 2 at 5. Petitioner's pre-vaccination history is significant for a mitral valve prolapse first diagnosed in 1999. Ex 7.1 at 53.

On November 7, 2013, Petitioner received his influenza vaccination. Ex. 1 at 1.

On December 2, 2013, Petitioner visited UC Health after he "developed vision changes along with face tingling." Ex. 7.1 at 113. Petitioner also experienced nausea. *Id.* at 377. Petitioner received a diagnosis of "either central or peripheral vertigo." The provider notes by Dr. Cyrus Yamin state, "Given the acute onset, stroke team was called as well as a head CT was done which was fortunately negative. Is not candidate for TPA given the patient's stroke scale of 1 only for the patient's decreased sensation in his right lower face. Diagnosis still uncertain at this time." *Id.* at 116. Three MRIs taken on December 2, 3, and 5, 2013, along with an MRA taken on December 2, 2013, indicated that Petitioner may have been suffering from mild sinus disease. *Id.* at 119-20. Later medical records show that "on MRI/MRA with contrast, [Petitioner] had enhancement to the right 5th and 8th cranial nerves consistent with a viral neuritis." Ex. 8 at 36. Petitioner remained in the hospital until December 6, 2013. Ex. 7.1 at 358.

On December 5, 2013, Petitioner was seen by Dr. Reena Shah. Ex. 7.1 at 162. Dr. Shah noted that on December 2, 2013, in addition to facial numbness, Petitioner also experienced "acute sensation of room spinning and nausea +Muffled hearing on R" and "tracing of images." *Id.* Three different doctors spoke to Petitioner about his symptoms, but none were able to give a definitive diagnosis. Dr. Justin Golub's notes indicate that he believed "otologic dz could explain the vertigo and hearing loss, DDx based on hx includes first episode of R Meniere's disease, or R labyrinthitis," while Dr. Jennifer Vaughan wrote that after discussing Petitioner's results with Dr. Quinlan, they would "consider other differential diagnoses for symptoms." *Id.*at 164. Notes from Dr. Anca Galesanu indicate that Petitioner "was admitted for sudden onset vertigo that is suspicious for cardioembolic stroke to posterior fossa vs. Meniere's disease, BPPV, or labyrinthitis." *Id.* at 167. Dr. Jamie Gentile's notes indicate that Petitioner's symptoms "could be vestibular neuronitis, and or labyrinthitis, however this would not explain other neurologic deficits. The total picture does seem more like an ischemic event in the brain…." *Id.* at 174. Dr. John Quinlan's notes indicate that "this clinical picture is most concerning for a posterior circulation small stroke…." *Id.* at 183.

On December 6, 2013, Petitioner was seen again at UC Health. Ex. 7.1 at 141. Petitioner presented with "impairments, including balance and gait." *Id.* Petitioner also reported an "onset of dizziness with tracking." *Id.* at 142.

On December 9, 2013, Petitioner presented to the UC Health Emergency Department complaining of "continued right facial numbness as well as some visual blurring on that side." Ex. 7.1 at 412. Petitioner remained in the hospital until December 11, 2013. *Id.* at 423. Dr. Shawn Ryan's tentative findings were "unclear diagnosis of headache and some cranial nerve deficits which will require further evaluation." *Id.* at 414.

4

On December 10, 2013, Dr. Reena Shah's notes indicate that "at this point, leading suspicion is viral etiology vs separate peripheral processes. Patient is stable without further workup to do, so patient will be treated symptomatically." Ex. 7.1 at 423.

On December 31, 2013, Petitioner called for an ambulance due to headaches that "feel[] like top of head will blow off, vision changes on occasion." Ex. 9 at 96. Petitioner's symptoms were described as a "horrible headache." *Id.* The notes from this visit indicate that "neuro is bouncing [Petitioner] around." *Id.* Petitioner was noted to be taking "3200 mg ibuprofen per day, Tylenol 2gm, aleve 2 pills a day," had "word finding difficulties" and "still felt numbness in face." *Id.* at 99.

On January 2, 2014, Petitioner presented to Cincinnati Eye Institute for vision loss in his right eye. Ex. 5 at 7. Petitioner stated to the doctor that "it is moderate and started about 1 month(s) ago. They describe it as a loss of peripheral vision. The onset was sudden and it happens all of the time. It is associated with daily activities and chores. Additional symptoms include blurry vision. Patient was diagnosed with a pineal cyst, and around the same time all of the visual and cardiac problems started as well." *Id.* Petitioner was diagnosed with "decreased acuity in R eye." *Id.* at 10.

On January 23, 2014, Petitioner was seen by Dr. Jeffery Kuhn for a follow up from his December 2013 symptoms. Petitioner claimed "that all symptoms have resolved except some persistent right visual acuity changes that is correctable." Ex. 7.1 at 593. Dr. Kuhn diagnosed Petitioner with "resolved symptoms possibly related to acute viral polyganglionitis" and cleared Petitioner to return to flight nursing duties in two weeks. *Id.*

On January 28, 2014, Petitioner was seen by Dr. Jack Rubenstein at the UC Health Main Hospital. Ex. 7.2 at 633. Petitioner's symptoms were noted to be "resolved off of medicines." *Id.*

On January 30, 2014, Dr. Barry Skrobot, an otolaryngologist, wrote a letter clearing Petitioner to return to duties with CareFlite. Ex. 8 at 36. Dr. Skrobot wrote:

> [Petitioner's] history is that on December 4th, he awoke with severe dizziness. He was admitted, thought to be having a stroke, then thought to be having basilar infarct, on MRI/MRA with contrast, he had enhancement to the right 5th and 8th cranial nerves consistent with a viral neuritis. Took approximately a month for all the dizziness to resolve and he is now symptom-free. Coincidentally, he had his flu shot approximately 2 weeks before this onset and his otolaryngologist in Cincinnati states that there had been reports this year of similar neurological deficits temporally related to the flu shot.

Ex. 8 at 36.

Dr. Skrobot's assessment was that Petitioner had "resolved 5th and 8th nerve inflammation. He is able to return to work with no restrictions and on no medications other than his ongoing Lipitor." *Id.* On the same date, Dr. Jeffrey Kuhn also wrote a letter stating that Petitioner may return to work as a flight nurse with "no restrictions on his return to work." *Id.*

On February 25, 2014, Petitioner called UC Health to discuss "chronic headache following neuritis." Ex. 9 at 106. Petitioner also wanted to discuss a note for an exemption to receiving the flu vaccine. *Id.* Dr. Kay Johnson's notes state that "this is a new problem. The current episode started in the past 7 days. The problem has been gradually worsening. There has been no fever. Pertinent negatives include no chest pain, congestion, on rhinorrhea. He has tried decongestant for the symptoms. The treatment provided no relief." *Id.*

On May 15, 2014, Petitioner called UC Health regarding his headaches. Ex. 9 at 117. Dr. Veer Patel's notes indicate that "In Dec 2013, he had reaction to flu shot, caused stroke-like symptoms and had to be admitted to UCMC. Since then, he's had chronic headaches. Headaches occur daily, all day, constant, on top of head. Feels like a squeezing sensation. Nothing aggravates or alleviates the headaches." *Id.*

On May 21, 2014, Petitioner was seen for "new headache and blurring of vision in the right eye" by Dr. Sheetal Malik at the UC Health Main Hospital. Ex. 7.2 at 641. Dr. Malik noted that "since discharge [on December 11, 2013], patient has been suffering with chronic headaches for last 4-5 minutes."[5] Dr. Malik further wrote that Petitioner:

> states he has a daily headache for the last 4-5 months. At times when he gets a very bad headache, he gets a very bad aura, right side of face gets a numbness feeling that precedes a very bad headache, feels like squeezing headache on top of head. Typically has a 6/10 headaches daily and when they are bad its 10/10.

> Patient also reports significant memory problems, short term memory problems and also at times seems to have some word finding difficulty. Not clearly episodic. Reports that this is going on also since December. He also reports that with initial presentation he had some right sided arm twitching which was not fully evaluated.

Ex. 7.2 at 641. The next day, Petitioner was diagnosed with "headache, memory loss, unspecified epilepsy without mention of intractable epilepsy, other convulsions and jerking movement of extremities." *Id.* at 670.

On May 24, 2014, Petitioner was again seen at UC Health Main Hospital for headache and dizziness. Petitioner was discharged on May 25, 2014. Upon Petitioner's arrival to the emergency room, Petitioner's chief complaint was noted to be headache; "chronic since flu shot." Ex. 7.2 at 740. In the patient history, RN Josh Taylor noted "according to the patient, he was diagnosed with vestibular neuronitis as a reaction to a flu vaccine in December of last year." Ex. 7.2 at 676. At this visit, Petitioner reported largely the same symptoms as in December, with headaches, "right facial numbness and tingling, along with seeing 'tracers' that he describes as a flash of light." *Id.* CNP Sunshine Barhorst notes state that "patient is a 41-year-old male with history of vestibular neuritis related to a flu vaccine reaction 6 months ago" and "given the patient's complicated neurological history, it is unclear the etiology of his headache however my suspicion for mass effect, meningitis, and intracranial hemorrhage is low…." *Id.* at 679.

---

[5] As Dr. Malik states later that Petitioner "has a daily headache for the last 4-5 months", I believe that "minutes" was written in error and Dr. Malik in fact meant months in this portion of the record.

In a second patient history, taken May 25, 2014, Dr. Hani Kushlaf noted that "In Nov 2013 [Petitioner] had a flu shot, 10days [sic] later he developed sudden intractable vertigo, decreased hearing in R ear, numbness in R face and dizziness. He went to ED thinking he might have had a stroke which was r/o. Was dx with multiple cranial neuropathies that were thought to be of viral etiology. Soon after he developed a headache and jerking movements in RUE." Ex. 7.2 at 685. Dr. Kushlaf's tentative diagnosis was "chronic tension-type headache." *Id.*

On September 26, 2014, Petitioner called Dr. Robert Finlay at UC Health to discuss his headaches. Ex. 9 at 124. Dr. Finlay noted that the headaches were an "ongoing issue status post an episode of cranial neuritis attributed to flu vaccine." *Id.* Petitioner described the headaches as "severe and 'band-like' with assoc nausea." *Id.*

On October 20, 2014, Petitioner filed a request for a medical exemption from flu vaccination. Ex. 8 at 5. The form was filled out and signed by Petitioner's primary care provider, Dr. Robert Finlay. Under "approved reason for exemption", Dr. Finlay checked the box indicating the Petitioner "had a prior severe allergic reaction to Trivalent Influenza Vaccine, regardless of the component suspected to be responsible for the reaction." *Id.* This request was approved on October 24, 2014. *Id.* at 4.

On December 4, 2014, Petitioner was seen by Physician's Assistant Keith Zurmehly for hip pain. Ex. 7.2 at 804. Mr. Zurmehly noted that "the patient is an RN and is well aware of the possibility of AVN given the fact that he had recent prednisone burst treatments for a reaction to a flu vaccine. Notes about a year ago he had reaction to the flu vaccine and he has been having some issue ever since that include headaches and whatnot." *Id.* In Petitioner's past medical history, "flu vaccination reaction", "chronic headaches", and "vestibular neuritis" were all listed. *Id.* at 804-05.

On January 26, 2015, Petitioner was seen for a follow up regarding his hip pain. Ex. 7.2 at 866. Petitioner's medical history was significant for vertigo (12/2/2013) and cranial neuropathy (12/6/2013) among other conditions. *Id.*

On May 28, 2015, Petitioner was seen by Dr. Fredrick Zeller with complaints of disruptive sleeping and observed apneas. Ex. 3 at 23. At this visit, Petitioner was noted to have a history of PTSD, migraine headaches, mitral valve prolapse, patent foramen ovale, mitral regurgitation, vertigo, hyperlipidemia, chronic low back pain, and encephalomyelitis. *Id.* at 27.

On July 14, 2016, Petitioner was seen at the UC Health Emergency Department for "progressive loss of sensation and weakness in RUE [right upper extremity]." Ex. 7.2 at 915. Petitioner claimed "reduced sensation to lateral R forearm/arm up to his shoulder and weakness in his RUE. Denies weakness or loss of sensation to other extremities." *Id.* at 916. An MRI of the cervical spine and brachial plexus showed "cervical spondylosis". *Id.* at 1071. On August 2, 2016, Dr. Andrew Massey noted that Petitioner's symptoms seemed to be "acute onset weakness, numbness, and pain right arm may represent multiple radiculopathies versus brachial plexopathy." *Id.* at 1181. Dr. Massey noted that he "favored a diagnosis of idiopathic right brachial plexopathy with onset 7/12/16." *Id.*

On July 27, 2016, Petitioner was admitted to the UC Health Emergency Department with right arm pain stemming from his idiopathic brachial plexus neuropathy. Ex. 3 at 114. The pain was described as a "constant sharp searing pain." *Id.* Petitioner's medical history at this visit was significant for, among other things, "encephalitis and encephalomyelitis following immunization procedures." *Id.* at 115. Petitioner was also noted to be allergic to "influenza virus vaccines." *Id.*

On August 22, 2016, Petitioner was admitted to Lindner Center of Hope for "suicidal ideation following fall and disagreement with his wife." Ex. 4 at 6. Under "reason for admission", Dr. Joi Alicia Moore wrote:

> Patient states in 2013, he was working as flight nurse which was his dream job when he went and has [sic] his annual flu shot in right shoulder. Injection was in 11/13. In December 2013, patient developed cranial neuropathies including facial numbness, hearing loss, headache, vertigo, and blurring of vision in the right eye. Patient had extensive work-up and symptoms thought to be related to acute disseminated encephalomyelitis 2/2 to flu vaccine. Due to vertigo, patient was deemed no longer able to fly. Following initial diagnosis, patient went on short term disability and developed major depression. Depressive symptoms described as depressed mood and anhedonia with decreased energy, difficulty concentrating, increase mood lability, and increased guilt following the physical symptomology developed following diagnosis.

Ex. 4 at 6-7.

## III.    Expert Report of Dr. Jeffrey Kuhn

Petitioner submitted one expert report from Dr. Jeffrey Kuhn. Ex. 38. Dr. Kuhn noted that Petitioner's initial symptoms included "right facial numbness, right visual blurring and vertigo." *Id.* at 2. Dr. Kuhn noted that at the time, his presumptive diagnosis was viral polyganglionitis. *Id.* However, Dr. Kuhn also stated that Petitioner has received various diagnoses for his symptoms, including "viral polyganglionitis, viral polyneuropathy, vestibular neuronitis, vertigo, migraine, cranial neuropathy, encephalitis, and encephalomyelitis." *Id.* Dr. Kuhn indicated that he has since examined Petitioner in December of 2018, and currently believes that Petitioner's correct diagnosis is "migraine associated right cochlear-vestibular disorder and right visual disturbance." Ex. 38 at 2. He stated that this diagnosis is "reflective of the evolution of symptoms since December 2, 2013." *Id.* at 2-3. However, Dr. Kuhn couched this statement by saying "it is difficult to categorize the patient's set of symptoms into a diagnosis using current terminology….I believe that initial onset of symptoms were the result of an acute central nervous system process attributed to exposure to the influenza vaccine." *Id.* at 3. Dr. Kuhn also opined that "it would not be unusual for a patient to present with an otherwise normal neurological exam within days to weeks following the acute event." *Id.*

Dr. Kuhn next remarked on the timing of the onset of Petitioner's symptoms stating that "Although it is not always possible to determine whether an observed event that follows some time after a vaccination is causal or coincidental, it seems curious that this constellation of symptoms

would occur within four weeks following vaccination." Ex. 38 at 3. In linking the Fluvirin vaccination to Petitioner's injuries, Dr. Kuhn cited the package insert for the drug that "summarizes the potential 'nervous system disorders' that may arise as a result of vaccination including headache, dizziness, neuralgia, paresthesia, confusion, febrile convulsons [sic], Guillain-Barré Syndrome, myelitis (including encephalomyelitis and transverse myelitis), neuropathy (including neuritis), and paralysis (including Bell's Palsy)." *Id.*, *citing* Review of the Morbidity and Mortality Weekly Report (MMWR): Prevention and Control of Seasonal Influenza with Vaccines: Recommendations of the Advisory Committee on Immunization Practices – United States, 2013-2014 September 20, 2013/62(RR07);1-43) (describes the most common adverse events following vaccination specifically with Fluzone (Sanofi Pasteur) to include injection site reactions, pain, fever, myalgia, and headache and the most serious adverse event reported to the Vaccination Adverse Event Reporting System (VAERS) for trivalent, standard dose Influenza vaccines to be Guillain-Barré syndrome (GBS)).

Dr. Kuhn's theory of causation was molecular mimicry. Ex. 38 at 4. Dr. Kuhn opined that Petitioner's injury was "predicated upon the activation of the immune system by virtue of exposure to antigens within the vaccine and the production of antibodies as a result of an intact immunologic response that leads to immune-protection." *Id.*

## IV.   Parties' Arguments

Respondent argued that Petitioner has failed to establish a reasonable basis for his claim and is not eligible for an award of attorneys' fees and costs. Fees Resp. at 6. Citing the Federal Circuit's decision in *Perreira*, Respondent noted that in a reasonable basis inquiry, "a court should look not at the likelihood of success, but instead assess the feasibility of the claim, and [P]etitioner must offer more than an unsupported assertion that a vaccine caused an injury." *Id.* at 8 (citing *Perreira v. Sec'y of Health & Hum. Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

Respondent argued that Petitioner must establish that he actually has the conditions alleged and that it is Petitioner's burden to make a showing of at least one defined and recognized injury. *Id.* at 12, *citing Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011); *see also Lasnetski v. Sec'y of Health & Hum. Servs.*, 696 Fed. Appx. 497, 503-04 (Fed. Cir. 2017). Respondent argued that identification of at least one defined and recognized injury is critical to Petitioner's claim, because "a symptom or manifestation could indicate any number of different underlying injuries, each with its own pathology, making it impossible for the Court to accurately determine causation." *Id.*, *citing Lasnetski v. Sec'y of Health & Hum. Servs.*, 128 Fed. Cl. 242, 262 (2016), *aff'd* 696 Fed. Appx. 497 (Fed. Cir. 2017). Respondent argues that none of the evidence filed to date establishes that Petitioner has any of the injuries he alleges. *Id.* at 13.

Respondent also argued that "even if petitioner has vestibular neuronitis, a cranial neuropathy, or any other condition in December 2013, it was obvious that at the time the petitioner filed this case that his claim was unlikely to be successful" because Petitioner's symptoms resolved by early February 2013. *Id.* at 13.

Petitioner replied to Respondent arguing that a reasonable basis did exist at the time the petition was filed. *See* Fees Reply. Petitioner claimed that the medical records showed that Petitioner received the flu vaccine, had onset of neurological symptoms within an appropriate time frame and evidence of a neurologic condition that was never fully diagnosed. Fees Reply at 6. Petitioner noted that "the law of reasonable basis and totality of circumstances test do not require diagnostic or etiologic certitude as a precondition to filing a petition." *Id.* at 7. Petitioner argued that in this case, the totality of circumstances supports reasonable basis.

## V.    Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, the special master must determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

### A.    Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B.    Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has

affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 2019-1596, 971 F.3d 1337, 1346 (Fed. Cir. Aug. 19, 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

The Federal Circuit has noted that determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 U.S. Claims LEXIS 1437 at *13 (Fed. Cir. July 6, 2021). Citing the Fourth Circuit's ruling in *Sedar v. Reston Town Ctr. Prop., LLC*, the Federal Circuit has characterized "more than a mere scintilla" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *13, *citing Sedar v. Reston Town Ctr. Prop., LLC* (988 F.3d 756, 761 n.3 (4th Cir. 2021); *see also Kurtz v. Fels*, 63 Wash. 2d 871, 878 (Wash. 1964) (holding that proof beyond a mere scintilla requires "facts to be assessed by the senses" and something "tactile" rather than calculations); *Gibson v. Epting*, 426 S.C. 346, 352 (S.C. 2019) (describing scintilla as a "perceptible amount" and "not something conjured up by the shadows.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018).

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). A Petitioner need not provide medical or expert opinion on causation to show reasonable basis for her claim. *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *19. While a Special Master may consider the absence of relevant medical opinion as a factor in determining whether a claim had reasonable basis, such absence is not dispositive of the issue. *Id.* at *16.

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the

medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

### C. Attorneys' Fees and Costs

The Vaccine Act permits reimbursement of "reasonable" attorneys' fees and costs. § 15(e)(1). Special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991). The Federal Circuit has endorsed the use of the lodestar approach, in which a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). The court may then make an upward or downward departure from the initial calculation based on other specific findings. *Id*. at 1348. Although not explicitly stated in the statute, attorneys' costs are also subject to a reasonableness requirement. *See Perreira*, 27 Fed. Cl. 29 at 34.

Petitioner bears the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). However, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd* No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cl. 1993).

### VI.   Discussion

### A.  Good Faith

Petitioner is entitled to a presumption of good faith. *See Grice*, 36 Fed. Cl. 114 at 121. Respondent has not represented that they are contesting good faith in this matter. *See generally* Fees Resp. Based on my own review of the case, I find that Petitioner acted in good faith when filing this petition.

### B.  Reasonable Basis

Respondent objects to reasonable basis in this case on primarily two grounds. The first is that Petitioner did not establish that he had "at least one defined and recognized injury." Fees Resp. at 12.  Respondent's second argument is that even if Petitioner did, Petitioner's injury did not meet the six-month severity requirement. *Id.* at 13.

In Petitioner's medical records, the record is consistent in showing that Petitioner suffered from, among other injuries, vertigo, facial numbness, headaches, nausea, and dizziness beginning

on December 2, 2013. Ex. 7.1 at 162, 164, 167, 174 and 183. Petitioner's headaches continued through all of December, when on December 31, 2013, he called the hospital to describe headaches that made his head feel like "the top was going to blow off." Ex. 9 at 99.

Between December 2, 2013 and December 6, 2013, Petitioner was examined by several doctors. None were able to provide Petitioner with a definite diagnosis; at various points, Petitioner was given a differential diagnosis of an otologic disease, labyrinthitis, possible stroke, Meniere's disease, BPPV, or vestibular neuritis. Ex. 7.1 at 164, 167, 174. On December 9, 2013, Petitioner was given a tentative diagnosis of "headache and some cranial nerve deficits." *Id.* at 414.

The petition clearly states that Petitioner suffered from headaches. Pet. at 1. Although Petitioner was unable to articulate a cause for his headaches (not unlike his treating physicians), headaches by themselves have been recognized as an injury in the Program. *See, e.g., E.S. v. Sec'y of Health & Hum. Servs.*, 2020 U.S. Claims LEXIS 2929 at *114 (Fed. Cl. Spec. Mstr. Nov. 13, 2020) (Petitioner alleged headaches as one of her injuries following vaccination); *B.A. v. Sec'y of Health & Hum. Servs.*, No. 11-51V, 2018 U.S. Claims LEXIS 1828 (Fed. Cl. Spec. Mstr. Dec. 6, 2018) (Petitioner alleged that she suffered from chronic headaches). Furthermore, one of the many early diagnoses Petitioner received was "headache." Ex. 7.1 at 414. In May of 2014, Petitioner was also diagnosed with "chronic tension-type headache." Ex. 7.2 at 685.

The package insert for Fluvirin (cited by Dr. Kuhn in his report) states that side effects of the vaccine can include headache, dizziness, nausea, paralysis, and confusion. *See* Fluvirin Package Insert at 7, *available at* www.fda.gov%2Fmedia %2F75156%2Fdownload&usg= AOvVaw2tsDV7xZr8eL9kyY3EQCHw. Petitioner's medical records show that Petitioner experienced headaches, dizziness, facial numbness, word finding difficulty, and nausea beginning December 2, 2013. Ex. 7.1 at 162; Ex. 9 at 99. Medical records paired with the vaccine's package insert constitute objective evidence supporting reasonable basis. *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337 (Fed. Cir. Aug. 19, 2020).

Respondent also contends Petitioner should have known his Petition lacked reasonable basis at the time it was filed. Respondent argues that Petitioner's symptoms were fully resolved within three months, less than the six months required to meet the Vaccine Act's severity requirement. Fees Resp. at 13-14. Respondent argues that there is "no evidentiary basis" to show that Petitioner's December 2013 symptoms were related to his later symptoms beginning in February 2014. *Id.* at 14.

Petitioner's medical records show that he first experienced headaches on December 2, 2013. Ex. 7.1 at 163. By December 31, 2013, Petitioner was taking "3200mg of ibuprofen, Tylenol 2 gm, [and] aleve 2 pills a day" per day for his headaches. Ex. 9 at 99.

On January 23, 2014, Petitioner was seen by Dr. Jeffery Kuhn for a follow up from his December 2013 symptoms. Petitioner claimed "that all symptoms have resolved except some persistent right visual acuity changes that is correctable." Ex. 7.1 at 593. Petitioner was then seen by Dr. Jack Rubenstein at the UC Health Main Hospital on January 28, 2013. Ex. 7.2 at 633. Petitioner's symptoms were noted to be "resolved off of medicines." *Id.*

On January 30, 2014, Petitioner received a letter from Dr. Skrobot, which stated that it took approximately a month for all the dizziness to resolve and he is now symptom-free. Coincidentally, he had his flu shot approximately 2 weeks before this onset and his otolaryngologist in Cincinnati states that there had been reports this year of similar neurological deficits temporally related to the flu shot." Ex. 8 at 36.

On February 25, 2014, Petitioner called UC Health to discuss headaches that had begun on approximately February 18, 2014. Ex. 9 at 106. Petitioner was again seen on May 21, 2014 for headaches that had lasted four to five months and word finding difficulty. Ex. 7.2 at 641. The medical records state that headaches had been bothering Petitioner since the flu shot. *Id.* Similar notations indicating that Petitioner was suffering from chronic headaches are in the medical records from May 25, 2014 and September 26, 2014. *Id.* at 685; Ex. 9 at 124.

Petitioner's medical records contradict one another. In January of 2014, Petitioner had no symptoms and was taking no medications. However, from February 25, 2014, Petitioner's medical records show that he had purportedly been suffering from headaches since receipt of his flu shot. Ex. 7.2 at 641. The later medical records constitute *some* evidence that Petitioner suffered from his headaches for longer than six months. It is also persuasive that Petitioner suffered from word finding difficulty both in December of 2013 and in February of 2014. Ex. 9 at 99; Ex. 7.2 at 641.

In sum, Petitioner has presented sufficient evidence to meet his burden. He has provided some evidence that he suffered from headaches for more than six months; he has submitted an expert report linking his flu vaccine to his condition; his expert cited to the vaccine package insert which indicates that headaches are a potential side effect of the vaccine; and one of his treating physicians exempted Petitioner from receiving further flu vaccines, due to "a prior severe allergic reaction." This evidence is sufficient to establish a reasonable basis.

## VII.   Interim Attorneys' Fees

Petitioner requests a total of $39,165.00 in interim attorneys' fees.[6] Interim Fees App. at 1, ECF No. 35.

### A.   Reasonable Hourly Rate

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorney's experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for

---

[6] As this case concluded on December 10, 2019, I have not addressed the undue hardship inquiry here.

subsequent years.[7]

Petitioner requests the following hourly rates for the attorney and paralegals who have worked on this matter to date:

| Name | 2016 | 2017 | 2018 |
|---|---|---|---|
| D. Stadelnikas (Attorney) | $359.00 | - | - |
| I. Kalinowski (Attorney) | $349.00 | $358.00 | $368.00 |
| Paralegal | $135.00 | $145.00 | $148.00 |
| Paralegal | $145.00 | $145.00 | $148.00 |

These rates are consistent with the Fee Schedule and with what these attorneys have been awarded in the past. *See Robinson v. Sec'y of Health & Hum. Servs.*, No. 15-967V, 2018 U.S. Claims LEXIS 1504 (Fed. Cl. Spec. Mstr. Sept. 12, 2018); *Averitt v. Sec'y of Health & Hum. Servs.*, No. 16-938V, 2018 U.S. Claims LEXIS 1293 (Fed. Cl. Spec. Mstr. Sept. 4, 2018); *Ritchie v. Sec'y of Health & Hum. Servs.*, No. 16-514V, 2018 U.S. Claims LEXIS 422 (Fed. Cl. Spec. Mstr. Mar. 23, 2018). I find the requested rates to be reasonable and that no adjustment is warranted.

### B.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [are] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015).

Petitioner's counsel has provided a breakdown of hours billed and costs incurred. Fees App., Tab 2. I have reviewed this breakdown and find a reduction is necessary for items such as internal communications, reviewing CM/ECF notifications, filing documents, reviewing billing records, reviewing case files, and secretarial tasks. Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26.

---

[7] The 2018 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.  The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

The reductions for paralegal time at $135.00/hour in 2016 occur on 8/9/2016 (0.3 hours), 8/9/2016 (0.1 hours),[8] 8/18/2016 (0.2 hours), 9/13/2016 (0.2 hours), 9/27/2016 (0.2 hours), 10/20/2016 (0.1 hours), 11/3/2016 (four entries totaling 0.7 hours), 11/4/2016 (0.2 hours), 11/6/2016 (0.2 hours), 11/7/2016 (0.1 hours), 11/10/2016 (0.2 hours), 11/22/2016 (0.2 hours), 12/6/2016 (two entries totaling 0.6 hours), 12/7/2016 (0.2 hours), and 12/8/2016 (0.2 hours) for a total reduction of 3.7 hours. This equals a reduction of **$499.50**.

The reductions for paralegal time at $145.00/hour in 2017 occur on 1/10/2017 (three entries totaling 0.4 hours), 1/12/2017 (0.2 hours), 1/13/2017 (0.1 hours), 2/9/2017 (0.1 hours), 2/10/2017 (0.1 hours), 3/13/2017 (four entries totaling 0.4 hours), 3/21/2017 (two entries totaling 0.2 hours), 3/22/2017 (0.1 hours), 4/12/2017 (0.1 hours), 5/8/2017 (two entries totaling 0.2 hours), 5/9/2017 (0.1 hours), 5/31/2017 (two entries totaling 0.4 hours), 6/7/2017 (0.1 hours), 6/9/2017 (0.1 hours), 6/12/2017 (0.1 hours), 7/20/2017 (0.2 hours), 7/21/2017 (0.2 hours), 8/9/2017 (0.1 hours), 8/15/2017 (0.2 hours), 10/5/2017 (0.2 hours), 10/6 2016 (0.1 hours), 10/10/2017 (three entries totaling 0.5 hours), 10/31/2017 (0.2 hours), 12/4/2017 (0.1 hours), 12/11/2017 (three entries totaling 0.4 hours), and 12/12/2017 (0.2 hours) totaling 5.1 hours. This equals a reduction of **$739.50.**

The reductions for paralegal time at $148.00/hour in 2018 occur on 2/12/2018 (0.2 hours) for a total of 0.2 hours. This equals a reduction of **$29.60.**

The reductions in attorney time at $349.00/hour in 2016 occur on 11/3/2016 (two entries totaling 0.35 hours), 11/5/2016 (0.1 hours), 11/6/2016 (0.1 hours), 12/6/2016 (two entries totaling 0.3 hours), and 12/8/2016 (0.1 hours) for a total reduction of 0.95 hours. This equals a reduction of **$331.55**.

The reductions in attorney time at $358.00/hour in 2017 occur on 11/3/2016 (0.1 hours), 1/13/2017 (two entries totaling 0.4 hours), 2/9/2017 (0.1 hours), 2/12/2017 (0.2 hours), 3/6/2017 (0.2 hours), 3/13/2017 (two entries totaling 0.2 hours), 3/21/2017 (0.2 hours), 3/22/2017 (0.1 hours), 4/14/2017 (0.1 hours), 5/9/2017 (0.1 hours), 6/12/2017 (0.1 hours), 6/16/2017 (0.2 hours), 7/14/2017 (0.2 hours), 7/20/2017 (0.2 hours), 8/16/2017 (0.1 hours), 8/23/2017 (0.5 hours), 10/5/2017 (0.2 hours), 10/5/2017 (0.1 hours), 11/1/2017 (0.1 hours), 12/5/2017 (0.1 hours), and 12/19/2017 (0.1 hours) totaling 3.6 hours. This equals a reduction of **$1,288.80**.

The reduction in attorney time at $368.00/hour in 2018 occurs on 2/13/2018 (0.1 hours) for a total of 0.1 hours. This equals a reduction of **$36.80.**

Total interim attorneys' fees to be awarded: **$36,239.25**.

## C.  Reasonable Costs

---

[8] This entry includes billing time for both a "discussion with assigned paralegal" and finalizing "correspondence to client regarding executed retainer packet." Fees App. Tab 2 at 2. I have accordingly reduced this time by one-half, rather than deducting it in its entirety. In the future, Mr. Kalinowski is encouraged to avoid block billing so he may be credited for all the work he has done.

Petitioner requests a total of $4,439.46 in filing fees, medical records, travel costs, postage costs and expert fees.

### 1. *Petitioner's Expert Fees*

Petitioner requests $3,100.00 in expert fees for Dr. Carlo Tornatore. Ex. 36 at 1. Petitioner requests a rate of $400.00/hour for Dr. Tornatore. Ex. 36 at 24. This rate is consistent with what Dr. Tornatore has been awarded in the past and I see no reason to disturb such a request. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08-243V, 2015 U.S. Claims LEXIS 620 (Fed. Cl. Spec. Mstr. Apr. 28, 2015); *Reeves v. Sec'y of Health & Hum. Servs.*, No. 15-1284V, 2019 U.S. Claims LEXIS 2138 (Fed. Cl. Spec. Mstr. Nov. 21, 2019). Although Dr. Tornatore did not produce an expert report, he spent 7.75 hours reviewing medical records and provided a recommendation to Petitioner's counsel. Ex. 36 at 24. I find this to be a reasonable amount of time, given the volume and complexity of medical records filed in this case. I therefore award this amount in full.

### 2. *Petitioner's Miscellaneous Costs*

Petitioner requests an additional $1,339.46 in miscellaneous costs, including obtaining medical records, the Court's filing fee, research costs, postage costs and travel costs. Ex. 36 at 1. I have reviewed these expenditures and find them reasonable. I therefore award them in full.

Total costs to be awarded: **$4,439.46**.

## VIII.  Final Attorneys' Fees

Petitioner requests a total of $22,303.72[9] in final attorneys' fees. Interim Fees App. at 1, ECF No. 59.

### A.  Reasonable Hourly Rate

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorney's experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for

---

[9] It is unclear if this is the amount requested by Petitioner. Petitioner's brief states that "Petitioner's counsel has reduced the total attorneys' fees of $22,303.72 by 18.3%, which brings it down to $18,222.00." Final Fees App. at 13. As the total requested amount listed under "Services subtotal" is $22,303.72, I have assumed that this is the amount requested. Final Fees App., Ex. 1 at 11.

subsequent years.[10]

Petitioner requests the following hourly rates for the attorney and paralegals who have worked on this matter to date:

| Name | 2018 | 2019 | 2020 |
|------|------|------|------|
| Barbara Bonar | $506.62 | $526.88 | $547.96 |
| Otwell Rankin | $380.37 | $395.58 | $411.40 |
| Paralegals | $145.00 | $145.00 | $145.00 |

Petitioner asserts that these rates are appropriate in light of Ms. Bonar and Mr. Rankin's experience. Final Fees App. at 11-12. Furthermore, Petitioner's counsel asserts that "Fee petitions and hourly rates submitted by Petitioner's counsel in multiple vaccine matters have been approved by Special Masters." *Id.* at 12, *citing Jones v. Sec'y of Health & Hum. Servs.*, No. 13-279V, 2016 U.S. Claims LEXIS 1897 (Fed. Cl. Spec. Mstr. Nov. 18, 2016); *Windhorst v. Sec'y of Health & Hum. Servs.*, No. 13-674V, 2017 U.S. Claims LEXIS 1327 (Fed. Cl. Spec. Mstr. Sept. 27, 2017); *Haubner v. Sec'y of Health & Hum. Servs.*, No. 16-1426V, 2019 U.S. Claims LEXIS 160 (Fed. Cl. Spec. Mstr. Feb. 8, 2019).[11]

The majority of Ms. Bonar and Mr. Rankin's work in this case was done outside the District of Columbia. Final Fees App. at 10. Their offices are located in the Cincinnati, Ohio metropolitan area. *Id.* Accordingly, it is appropriate to compare Cincinnati rates and District of Columbia rates to ascertain whether the two differ significantly. *See Avera*, 515 F.3d at 1349.

Special Masters Corcoran, Gowen and Roth have addressed reasonable hourly rates for Ms. Bonar and Mr. Rankin in *Masktell v. Sec'y of Health and Hum. Servs.*, No. 16-1154V, 2018 U.S. Claims LEXIS 1515 (*Jones v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2016 WL 7233938 (Fed. Cl. Spec. Mstr. Nov. 18, 2016) and *Windhorst v. Sec'y of Health & Hum. Servs.*, 2017 WL 4768125 (Fed. Cl. Spec. Mstr. Sept. 27, 2017), respectively. In those cases, as here, the majority of Ms. Bonar and Mr. Rankin's work was performed in the Cincinnati metropolitan area. *Jones*, 2016 WL 7233938, at *2; *Windhorst*, 2017 WL 4768125, at *2. To determine whether Cincinnati rates differed significantly from District of Columbia rates, Special Masters Corcoran, Gowen and Roth looked to the "Rubin Committee" rates, an index of attorney's fee rates often

---

[10] The 2018 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.
The 2019 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.
The 2020 Fee Schedule can be accessed at: http://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202020.PPI_OL.pdf
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

[11] Counsel's assertion is not entirely accurate. While Petitioner's counsel has indeed received fees in prior cases, in each of these cases, counsel's rates were reduced to conform with the *McCulloch* range.

used in Cincinnati-area attorney's fee calculations. *Masktell*, 2018 U.S. Claims LEXIS 1515 at *5-6, *Jones*, 2016 WL 7233938, at *3; *Windhorst*, 2017 WL 4768125, at *2.

The Rubin Committee rates were set in 1983 when, "in response to the growing number of statutes that required the trial court to determine a reasonable fee to award the prevailing party, former Chief Judge Carl Rubin of the Southern District of Ohio formed a committee to determine a reasonable fee for attorneys in the Cincinnati area." *Kindel v. Cont'l Cas. Co.*, No. 1:02CV879, 2005 WL 1241975, at *4 (S.D. Ohio May 25, 2005). The rates are increased by four percent annually for cost of living, Jones, 2016 WL 7233938, at *3, and decisions from the Southern District of Ohio continue to reference the adjusted rates when determining appropriate attorney's fee awards. *See, e.g., Concepta Bus. Sols., LLC v. Cogent Analytics, LLC*, No. 1:16-cv-438, 2017 WL 1881341, *10 (S.D. Ohio May 9, 2017); *Vigna v. Emery Fed. Credit Union*, No. 1:15-cv-51, 2016 WL 7034237, *5 (S.D. Ohio Dec. 2, 2016). Adjusted for cost of living, the Rubin Committee rates for 2018-20 are:[12]

| Experience | 1983 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 0-2 years | $61.77 | $243.74 | $253.49 | $263.63 |
| 2-4 years | $71.62 | $282.62 | $293.92 | $305.68 |
| 4-5 years | $82.81 | $326.77 | $339.84 | $353.54 |
| 6-10 years | $96.39 | $380.37 | $395.58 | $411.40 |
| 11-20 years | $113.43 | $447.61 | $465.51 | $484.13 |
| 20+ years | $128.34 | $506.62 | $526.88 | $547.96 |

Ms. Bonar was first admitted to the bar in 1984, giving her thirty-four years of experience. Fees App. at 12. She thus falls in the "20+ years of experience" category. Mr. Rankin began practicing law in 2009, meaning he had nine years of experience in 2018, ten years of experience in 2019, and eleven years of experience in 2020. He therefore falls in the "6-10 years of experience" category for 2018-19, and the "11-20 years of experience" category for 2020. *Id.* However, as indicated by Special Masters Corcoran, Roth and Gowen, Rubin Committee rates should be reduced by 18.3 percent in Program cases in order to eliminate the risk premium. *See, e.g.*, *Jones*, 2016 WL 7233938, at *3 (citing *McCulloch*, 2015 WL 5634323, at *17-19). Accordingly, taking into account their respective years of experience and the 18.3 percent reduction, the local rates for Ms. Bonar and Mr. Rankin should be considered as follows:

| Attorney | 2018 | 2019 | 2020 |
|---|---|---|---|
| Ms. Bonar | $413.91 | $430.46 | $447.68 |
| Mr. Rankin | $310.76 | $323.19 | $395.53 |

As indicated by Special Masters Corcoran, Gowen, and Roth, these rates are not substantially different from the District of Columbia rates enumerated in *McCulloch* and subsequently embraced by the Office of Special Masters. *Masktell*, 2018 U.S. Claims LEXIS 1515

---

[12] It appears that the Rubin Committee Rates are unavailable in a simple table through a Google Search. Petitioner's brief cites *West v. AK Steel Corp. Ret. Acc. Pension Plan*, 657 F. Supp. 2d 914, 932 (S.D. Ohio, Feb. 7, 2014), but this case only outlines rates from 2013-2017. *Id.* at 932. I have therefore calculated the appropriate Rubin Rate by multiplying each successive year by 1.04.

at *6, *Jones*, 2016 U.S. Claims LEXIS 1897 at *4; *Windhorst*, 2017 U.S. Claims LEXIS 1327 at*2. Petitioners' counsel should therefore receive forum rates.[13]

Applying forum rates and adhering to the rates set out for Ms. Bonar and Mr. Rankin in *Masktell*, *Jones*, and *Windhorst*, I will employ the following rates:[14]

| Attorney | 2018 | 2019 | 2020 |
|----------|--------|--------|--------|
| Ms. Bonar | $410.00 | $418.00 | $436.00 |
| Mr. Rankin | $291.00 | $297.00 | $337.00 |
| Paralegal | $145.00 | $145.00 | $145.00 |

### B.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [are] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed and costs incurred. Fees App., Ex. 1. I have reviewed these hours and find that a reduction is appropriate for items such as reviewing CM/ECF notifications, internal communications, converting documents to PDF and other secretarial tasks, and block billing.[15]

The entries to be deducted from Mr. Rankin's time in 2018 occur on 3/21/2018 (0.15 hours), 3/28/2015 (0.05 hours), 4/13/2018 (0.1 hours), 7/24/2018 (0.3 hours), 7/29/2018 (0.1 hours), 7/29/2018 (0.05 hours), 8/31/2018 (0.1 hours), 9/3/2018 (0.05 hours), 9/30/2018 (0.75

---

[13] Mr. Rankin's forum rate for 2020 is adjusted to reflect that he has now practiced law for eleven years.

[14] I will note that this is at least the fourth time counsel's rates have required adjustment by the Court. This continued need to correct counsel's rates should not occur; counsel should update their billing rates accordingly. Failure to do so in the future will lead to a larger reduction in fee awards.

[15] In some cases, Petitioner's counsel has engaged in block billing, making it impossible to tell how much time Petitioner spent on compensable tasks. In these instances, I have reduced the requested amount by half. To ensure Petitioner's counsel is paid for the proper amount of time, counsel is encouraged to avoid block billing practices in the future.

hours),[16] 10/24/2018 (0.15 hours), 10/31/2018 (0.1 hours), 11/2/2018 (0.05 hours), 11/2/2018 (0.1 hours), 11/5/2018 (0.05 hours), 11/9/2018 (0.05 hours), 11/12/2018 (0.2 hours), 11/26/2018 (two entries totaling 0.15 hours), 11/28/2018 (0.1 hours), 12/3/2018 (0.5 hours), 12/6/2018 (0.1 hours), 12/7/2018 (0.05 hours),[17] and 12/29/2018 (0.1 hours) for a total deduction of 3.35 hours. Mr. Rankin will therefore be compensated for 16.2 (19.55 – 3.35) hours of work in 2018 at a rate of $291.00/hour for a total of **$4,714.20**.

The entries to be deducted from Mr. Rankin's time in 2019 occur on 1/18/2019 (0.15 hours), 2/12/2019 (0.05 hours), 3/11/2019 (0.1 hours), 3/13/2019 (0.05 hours), 5/28/2019 (0.05 hours), 7/10/2019 (0.1 hours), 8/6/2019 (0.15 hours), 8/7/2019 (0.15 hours), 8/8/2019 (0.05 hours), 8/21/2019 (0.1 hours), 10/4/2019 (0.05 hours), 10/8/2019 (0.05 hours), 11/21/2019 (0.05 hours), and 12/10/2019 (0.15 hours) for a total deduction of 1.25 hours. Mr. Rankin will therefore be compensated for 22.45 (23.7 – 1.25) hours of work in 2019 at a rate of $297.00/hour for a total of **$6,667.65**.

The entry to be deducted from Mr. Rankin's time in 2020 occurs on 7/1/2020 (0.4 hours) for a total deduction of 0.4 hours. Mr. Rankin will therefore be compensated for 6.9 (7.3 – 0.4) hours of work in 2020 at a rate of $337.00/hour for a total of **$2,325.30.**

The entry to be deducted from Ms. Bonar's time in 2019 occurs on 9/5/2019 (0.25 hours). Ms. Bonar will therefore be compensated for 1.55 hours of work in 2019 at a rate of $418.00/hour for a total of **$647.90**.

Ms. Bonar will be credited in full for her hours worked in 2020 at a rate of $436.00/hour. Ms. Bonar worked a single hour in 2020. Final Fees App., Ex. 1 at 11. I therefore award **$436.00** for Ms. Bonar's work in 2020.

The entries to be deducted from paralegal time in 2018 occur on 3/21/2018 (0.1 hours), 6/11/2018 (0.1 hours), 8/31/2018 (0.1 hours), and 11/1/2018 (0.1 hours) for a total deduction of 0.4 hours.

The entries to be deducted from paralegal time in 2019 occur on 2/11/2019 (0.1 hours), 3/11/2019 (0.1 hours), 6/7/2019 (0.2 hours), 11/6/2019 (0.1 hours), and 12/6/2019 (0.1 hours) for a total deduction of 0.6 hours. This results in a total deduction of 1.0 hours between 2018-19. I

---

[16] This entry reads "prepare and email Exhibit 7 to Dr. Kuhn." Fees App., Ex. 1 at 3. This exhibit was filed on December 6, 2016 by Petitioner's former counsel. ECF No. 6. While Exhibit 7 is a large document (nearly 3,000 pages), time spent downloading and emailing the exhibit to an expert is a secretarial task and therefore not compensable.

[17] The entries from 11/2/2018, 11/5/2018, 11/9/2018, 11/26/2018 (two entries), 11/28/2018, 12/3/2018, 12/6/2018, and 12/7/2018 appear to be bills for arranging an appointment for Petitioner to meet with Dr. Kuhn. Fees App., Ex. 1 at 5. Arranging appointments/travel to such appointments is work that is secretarial in nature and therefore not compensable in the program.

will thus credit Petitioner's counsel with 0.1 hours of paralegal work (1.1 – 1.0) at a rate of $145.00/hour, for a total of **$14.50**.

Total attorneys' fees to be awarded: **$14,805.55 (4,714.20 + 6,667.65 + 2,325.30 + 647.90 + 436.00 + 14.50).**

### C.  Reasonable Costs

Petitioner requests a total of $7,223.54 in costs related to expert Dr. Jeffrey Kuhn, including payment to Dr. Kuhn and travel expenses for Petitioner to be examined by him. Final Fees App., Ex. 1 at 13.

#### 1.  *Dr. Kuhn' Expert Fees*

Petitioner requests $6,500.00 for Dr. Kuhn's expert fees. Fees App., Ex. 1 at 11. This is broken down into costs for Dr. Kuhn's retainer ($700.00) and costs for Dr. Kuhn's expert report ($5,800.00). *Id.*

Dr. Kuhn completed a bachelor's degree in biology from the University of Virginia in 1981 and graduated from the medical school in 1985. Kuhn CV, Ex. 39 at 2. He completed residency at the National Naval Medical Center from 1988-1991 and served as the chief resident at the Medical Center from 1991-92. *Id.* Dr. Kuhn completed a fellowship at the Florida Ear Research Foundation in Otology/Neurology from August 1994 – July 1995. Dr. Kuhn is board certified in Otolaryngology (1993), with a sub-specialty certification in Neurotology (2012). *Id.* Dr. Kuhn has actively practiced since 1995 and currently is a member of five different medical practices around Virginia. *Id*. at 1. I find Dr. Kuhn to be well qualified as an expert and the amount billed to be reasonable given the number of medical records needing review in this case.[18] I therefore will award Dr. Kuhn's expert fees in full for a total of **$6,500.00**.

#### 2.  *Petitioner's Miscellaneous Costs*

Petitioner requests $385.00 for Dr. Kuhn's examination of Petitioner and $238.54 for Petitioner's hotel stay during Dr. Kuhn's examination, Final Fees App., Ex. 1 at 11. I have reviewed the supporting documentation for Petitioner's requests regarding Dr. Kuhn's examination and Petitioner's hotel and find these requests to be reasonable. Final Fees App., Ex. 10 at 1, Ex. 11 at 1. I therefore award **$623.54** for these costs.

---

[18] Dr. Kuhn's invoice is a single line entry noting 13 hours spent on "medical review" for this case. Final Fees App., Ex. 9 at 1. Block billing is generally disfavored in the Program. *See, e.g., Laderer v. Sec'y of Health & Hum. Servs.*, No. 09-97V, 2016 U.S. Claims LEXIS 623 at *19-20 (Fed. Cl. Spec. Mstr. Apr. 20, 2016). As I find $6,500.00 to be a reasonable overall bill to review medical records and produce an expert report in this case, I will credit Dr. Kuhn for his billed amount in full. I have not conducted an analysis of Dr. Kuhn's hourly rate. In the future, Petitioner's counsel is cautioned to ensure expert invoices are sufficiently detailed to demonstrate their relation to the prosecution of the petition. *See* Guidelines for Practice at 69.

Petitioner also requests $100.00 for "advance to client for travel expenses to appointment with Dr. Kuhn in Virginia." Petitioner's supporting documentation for Petitioner's travel expenses is a check made out from Petitioner's counsel to Petitioner. Fees App., Ex. 12 at 1. This check does not show how Petitioner traveled to the appointment, how far Petitioner traveled, nor the exact cost of travel. However, I find $100.00 to be a reasonable amount to travel to and from an appointment and will therefore reimburse Petitioner for this cost. Petitioner's counsel is cautioned that in the future, applications for cost reimbursements must include sufficient supporting documentation.

Total costs to be awarded: **$7,223.54.**

## IX.    Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of fee and cost awards, and based on the foregoing, I **GRANT IN PART** Petitioner's application, as follows:

A lump sum in the amount of **$40,678.71**, representing reimbursement of Petitioner's interim attorneys' fees and costs in the form of a check jointly payable to Petitioner and his former attorney, Mr. Isaiah Kalinowski.

A lump sum in the amount of **$22,029.09**, representing reimbursement of Petitioner's final attorneys' fees and costs in the form of a check jointly payable to Petitioner and his current attorney, Mr. Otwell Rankin.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with this decision.[19]

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master

---

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.